UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RENEWABLE FUELS ASSOCIATION and GROWTH ENERGY,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and UNITED STATES DEPARTMENT OF ENERGY,<br><br>Defendants. | Civil Action No. 18-2031 (JEB) |

**MEMORANDUM OPINION**

Under the Environmental Protection Agency's Renewable Fuel Standard program (RFS), covered oil refineries must introduce a certain volume of renewable fuel, such as ethanol, into the transportation fuel supply each year. From 2015 to 2017, EPA nonetheless granted exemptions to dozens of refineries, finding them to have met the statutory criterion of "disproportionate economic hardship." 42 U.S.C. § 7545(o)(9)(B)(i). Prior to this Freedom of Information Act suit, however, it had not published any records of its decisions to afford or deny such relief to any particular refinery. Prompted by Plaintiff trade associations' FOIA requests and this litigation, EPA has now produced 72 decision documents from those years, but it has withheld from many of them two elements of information: (i) the petitioner's name and (ii) the location of the facility for which relief was requested. The agency grounds its withholding in FOIA Exemption 4, claiming that disclosing the redacted information would reveal "commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C.

1

§ 552(b)(4); see ECF No. 58-3 (Vaughn Index) at 2–3. Plaintiffs disagree and now move for partial summary judgment to compel disclosure.

With a minor caveat, the Court sides with the Government. Divulging the identity of the refinery at issue in an RFS determination document would reveal the fact that said refinery applied for the exemption. And for most (but not all) of the refineries at issue, EPA has demonstrated that such information meets all three requirements of Exemption 4: it is commercial or financial, it is obtained from a person, and it is privileged or confidential. As to a small number of redactions, however, the Court will order that EPA reconsider its decision.

**I.  Background**

   A.  Legal and Factual Background

Congress first enacted the Renewable Fuel Standard program in the mid-2000s, with the goal of forcing the market to produce increasing volumes of renewable fuel each year. See Renewable Fuel Standard Program: Standards for 2018 and Biomass-Based Diesel Volume for 2019, 82 Fed. Reg. 58,486, 58,487 (Dec. 12, 2017). Under the program, oil refineries are required to produce a certain volume of biofuels as a percentage of the overall volume of fuel they turn out. See id. at 58,488; Renewable Fuels Ass'n v. EPA (RFA), 948 F.3d 1206, 1222 (10th Cir. 2020), cert. granted sub nom. HollyFrontier Cheyenne v. Renewable Fuels Ass'n, No. 20-472, 2021 WL 77244 (U.S. Jan. 8, 2021). "Small refineries" averaging fewer than 75,000 barrels per day of crude-oil throughput, however, may be exempted from RFS requirements "for the reason of disproportionate economic hardship." 42 U.S.C. §§ 7545(o)(1)(K), (9)(B)(i); 40 C.F.R. § 80.1441(e)(2).

For years, EPA did not release any information at all about its decisions to grant or deny small-refinery exemptions. After coming under pressure to be less secretive, the agency relented

and in 2018 began providing a dashboard with aggregate-level data. See ECF No. 51-1 (Pl. SJ Mot.) at 5; Erin Voegele, Wheeler: EPA to create public 'dashboard' on RFS waivers, Biodiesel Magazine (Aug. 2, 2018), https://bit.ly/39hrz2M. Those data reveal an interesting trend. For the program's first two years, 59 refineries were granted exemptions. See ECF No. 51-1, Exh. A (2011 Small Refinery Exemption Study) at 26. As the industry adjusted to the RFS requirements, the number declined, totaling just seven in 2015. See EPA, RFS Small Refinery Exemptions, https://bit.ly/3a7pGVH (last visited Jan. 25, 2021). After a change in presidential administrations, however, the number of exemptions again increased substantially, from 19 granted in 2016, to 35 in 2017, and 32 in 2018. Id. EPA's grant rate also skyrocketed, from around 25% for the years 2013 to 2015 to an apex of 95% in 2017. Id. Even as it disclosed these high-level numbers, EPA did not identify the specific refineries that received exemptions, nor did it publish any of its decisions to grant or deny an exemption petition.

    B.  Procedural History

That changed after two nonprofit trade associations, known as the Renewable Fuels Association (RFA) and Growth Energy, and one of Growth Energy's member organizations submitted FOIA requests to EPA and one to the Department of Energy seeking information about the specific refineries that had sought exemptions. See ECF No. 1-1, Exhs. B, H, J, M, P, R, U (Requests). After neither agency timely responded to any request, RFA and Growth Energy filed this action on August 30, 2018. See ECF No. 1 (Complaint). The parties ultimately agreed to a production schedule for responsive documents from both agencies. See ECF No. 19 (March 29, 2019, Joint Status Report) at 1–2. DOE completed its production about a month later, although it referred some redacted documents to EPA for further review. See ECF No. 20 (April 29, 2019, Joint Status Report) at 1. EPA, for its part, agreed to a three-phase production

schedule. See March 29, 2019, Joint Status Report at 1–2. Phase I encompasses certain final decisions by EPA to grant or deny a small-refinery exemption in 2016 and 2017; Phases II and III contain additional responsive documents, about which the Court will say no more as they are not the subject of the instant Motion.

In early 2020, as part of its Phase I production, EPA initially produced a total of 55 decision documents revealing its exemption decisions in 2016 and 2017. See ECF No. 58-2 (Declaration of Kevin M. Miller), ¶ 19. After providing the affected refineries the ability to submit confidentiality claims regarding their petitions, the agency redacted the petitioner name and/or refinery location from 27 of the decision documents under FOIA Exemption 4. Id., ¶¶ 20, 26. As to the remaining 28 documents for which identifying information was disclosed, EPA concluded that 25 of the petitioning entities did not qualify for confidential treatment under FOIA, and the remaining three had not even claimed the information as private. Id., ¶ 20.

Shortly after that production, the Tenth Circuit decided RFA, 948 F.3d 1206, holding that refineries were not statutorily eligible for a small-refinery exemption in a given year unless they had received one for each prior year going back to the RFS's creation. Because only seven refineries had been granted an exemption in 2015, it follows that many of the exemptions granted by EPA in 2016 and 2017 were unlawful (although that conclusion has no effect on the propriety of withholding information from those decisions under FOIA). Plaintiffs — hoping to learn which refineries received those exemptions — requested that EPA immediately broaden the scope of Phase I to include decision documents from 2015. See ECF No. 47 (Motion for Hearing) at 3. EPA objected that the 2015 documents also likely contained confidential business information (CBI) subject to Exemption 4, and it argued that it should not have to undertake the necessary, time-consuming analysis of that issue until it reached Phase III of the existing phased

4

production schedule.  See ECF No. 48 (Response) at 2.  This Court eventually resolved the dispute by ordering the agency to either release, or specifically claim as exempt CBI, certain information about the 2015 documents within seven weeks: (1) the petitioner's name; (2) the name and location of the affected facility; (3) the general nature of relief requested; (4) the time period for which relief was requested; and (5) the extent to which EPA granted or denied relief. See Minute Order of July 23, 2020; ECF No. 58 (Def. Opp.) at 5–6.  With Plaintiffs' consent, the Court stayed further production of Phase II and Phase III records.  See Minute Order of July 23, 2020.

The agency then timely produced responsive excerpts from the 2015 RFS compliance year of 17 decision documents concerning 14 refineries.  See Miller Decl., ¶¶ 23, 32.  In seven of those documents, it withheld the petitioner's name and facility location, again claiming that information was covered by Exemption 4.  See id., ¶ 24.  As to the other ten documents, EPA rejected confidentiality claims from three of the petitioners, and the other seven had not sought to keep the information closely held.  Id.

All told, after this additional production, EPA has produced 72 small-refinery-exception decision documents covering the years 2015 through 2017.  It has withheld the facility's location in 34 documents and the petitioner's name in 26 of those.  Id., ¶¶ 25, 37.  Plaintiffs now move for partial summary judgment to resolve whether Exemption 4 permits EPA's withholdings and, they hope, to compel the agency to disclose the names and locations of the affected refineries. See Pl. SJ Mot. at 2.  In an effort to better understand the refineries' submissions and EPA's decisions, the Court ordered the Government to provide for *in camera* review copies of "the affected refineries' substantiations and EPA's confidentiality determinations."  Minute Order of

5

Jan. 21, 2021. Defendants have timely done so, and, having conducted its review, the Court is now ready to rule.

## II. Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986). There are no facts in dispute here, as is often true for FOIA cases; that is why such cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Office of the U.S. Trade Representative, 641 F.3d 521, 527 (D.C. Cir. 2011). In a FOIA case, a court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted). Such affidavits or declarations "are accorded a presumption of good faith." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991). "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

## III. Analysis

Enacted to "open agency action to the light of public scrutiny," Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted), FOIA provides that "each agency, upon any

[proper] request for records . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). Although the Act reflects "a general philosophy of full agency disclosure," Rose, 425 U.S. at 360, Congress also "enumerated nine exemptions from the disclosure requirement." Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002). As the Supreme Court recently explained, "[T]hose exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." Food Marketing Inst. v. Argus Leader Media, 139 S. Ct. 2356, 2366 (2019) (cleaned up) (citing Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1142 (2018)). The Government nonetheless still bears the burden "to show that requested material falls within a FOIA exemption" if it withholds that material. Norton, 309 F.3d at 32 (citation omitted).

In support of withholding the petitioner name and/or refinery location from its 2015–2017 exemption decision documents, EPA relies solely on Exemption 4. See Miller Decl., ¶¶ 37–46; Vaughn Index at 2–4. As noted above, that Exemption allows agencies to withhold "commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Translated, as everything is, into a tripartite test, EPA must therefore demonstrate that its redactions are necessary to protect information that is "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." WP Co. v. U.S. Small Bus. Admin., No. 20-1240, 2020 WL 6504534, at *5 (D.D.C. Nov. 5, 2020) (quoting Pub. Citizen Health Res. Grp. v. FDA, 704 F.2d 1280, 1290 (D.C. Cir. 1983)).

    A.  Information at Issue

Before separately addressing each prong, it is first necessary to clarify exactly what "information" is at issue here. At first blush, this might appear to be the literal words obscured by the agency's redactions — *i.e.*, the names and locations of refineries considered in isolation.

7

Yet, if revealing those literal words would necessarily imply or "reveal [other] information that" itself meets all three Exemption 4 prongs — here, the fact that the refinery at issue petitioned for and received a small-refinery exemption from the RFS program — then redactions are appropriate to avoid such disclosure. See WP Co., 2020 WL 6504534 at *7 (assuming that if disclosing certain loan parameters would "necessarily reveal[] a business's payroll," then withholding would be justified because payroll meets all three Exemption 4 elements); see also Nat'l Bus. Aviation Ass'n, Inc. v. FAA., 686 F. Supp. 2d 80, 86 (D.D.C. 2010) (similarly assuming that if release of aircraft registration numbers would allow "discovery [of] sensitive commercial information," withholding would be justified under Exemption 4); cf. Multi Ag Media LLC v. Dep't of Agric., 515 F.3d 1224, 1228–29 (D.C. Cir. 2008) (holding that "Exemption 6 applies to financial information in business records when . . . the records would necessarily reveal" other information covered by that exemption) (citation omitted); Citizens for Responsibility & Ethics in Washington v. United States Dep't of Justice, 160 F. Supp. 3d 226, 234–35 (D.D.C. 2016) (same approach for Exemption 1).

  Plaintiffs do not dispute this legal point. They also do not gainsay, nor could they, that disclosing the name and location of a refinery in the context of an EPA decision document would necessarily reveal that said refinery had applied for and was granted or denied an exemption. Instead, Plaintiffs contend that EPA engages in an impermissible sleight of hand by focusing on different "information" for different prongs of the Exemption 4 test; in other words, they posit that the purported CBI the agency analyzes is not consistent across all three prongs of the test. See ECF No. 59 (Reply) at 1–2, 5. When arguing that the information that must be protected satisfies prong one (commercial) and prong three (confidential), Plaintiffs point out that the agency focuses on a refinery's "status as a petitioner and/or recipient of a small refinery

8

exemption." Def. Opp. at 29; see also id. at 16 ("The petitioner's name and facility location[,] . . . if released, reveal that the refinery has attempted to establish [its eligibility for an exemption] and has either obtained [one] or not."). On the other hand, Plaintiffs argue, when claiming that the CBI was "obtained from a person" under prong two, EPA focuses on the name and location of the refinery in and of itself. See Reply at 5–6; Def. Opp. at 18–19 ("EPA obtained the petitioners' names and facility locations from the respective [exemption] petitions . . . and subsequently incorporated this information into [its] decision documents . . . . The information . . . was supplied to the agency by the small refineries' . . . petitions.") (emphasis added).

It is true that the agency's discussion of the "obtained from a person" prong, especially in its brief, could be read to argue that the refinery's name and location themselves are "obtained from a person." And the agency clearly cannot use different information to satisfy different prongs of the Exemption 4 test. In the Court's view, however, EPA does not make that obvious mistake. Although it does state that it "obtained the petitioners' names and facility locations from [their] petitions," it also explains that those petitions were "submitted . . . seeking a small refinery exemption," Def. Opp. at 18, and that "[t]he refineries' names and facility locations contained in [exemption] decision documents is the information at issue . . . ." Id. at 26 (emphasis added). Throughout its papers, moreover, EPA frequently referred to "petitioners' names and facility locations" as a shorthand for the information at issue, even where context makes clear that the agency's analytical focus was on the separate information those two "data elements" would reveal: viz., the fact that the identified refinery petitioned EPA and received a yes or no. Compare Def. Opp. at 16 ("The information withheld — the petitioners' names and the names and locations of the facilities — constitute commercial information . . . ."), with id. (explaining a few sentences earlier that "petitioner's name and facility location . . . if released,

9

reveal that the refinery has attempted" to secure an exemption); Vaughn Index at 2–3 (defining "withheld information" as "the petitioner's name and facility location," and then stating that "the withheld information is not available publicly," which is obviously not so if taken literally). Given EPA's consistent and repeated explanations that it withheld the names and locations of refineries because of what it would reveal about those refineries, not in order to protect the names and locations in and of themselves, see Def. Opp. at 8, 11, 14, 23–24, 25, 26, 29, 30, the Court will not put on blinkers in interpreting the agency's prong-two analysis. And, for what it is worth, Plaintiffs cannot claim to be sandbagged by the agency's lack of perfect clarity, having devoted a portion of their reply brief to analyzing prong two consistently with this interpretation of EPA's argument. See Reply at 5–6.

With that necessary if somewhat tedious detour complete, the Court is now ready to turn to the Exemption 4 factors. The question is whether the fact that a refinery applied for an exemption, or the distinct fact that it either received or did not receive such exemption, qualifies as (1) commercial or financial information (2) obtained from a person and (3) privileged or confidential.

### B. Commercial or Financial

"[T]he question of whether information is 'commercial' boils down to a common sense inquiry into whether the proponent has a business interest in that information." Kahn v. Fed. Motor Carrier Safety Admin., 648 F. Supp. 2d 31, 36 (D.D.C. 2009) (citing Pub. Citizen Health Res. Grp. v. FDA, 704 F.2d 1280, 1290 (D.C. Cir. 1983)). That requirement is easily met here. Common sense counsels that an oil refinery has a "business interest" in the facts that it applied for, and either received or did not receive, a small-refinery exemption. As to the latter, whether a refinery is exempt from RFS requirements or not directly affects how much renewable fuel it

must blend into its annual production or importation of gasoline, and an entity's "basic business operations and techniques" are undoubtedly commercial. Pub. Citizen v. U.S. Dep't of Health and Human Servs., 66 F. Supp. 3d 196, 207 (D.D.C. 2014). As to the separate fact that a refinery applied for an exemption, that fact too is commercial, as it shows that the refinery believed it suffered from, and attempted to establish, "unfavorable structural and economic conditions . . . that rise to the level of 'disproportionate economic hardship.'" Def. Opp. at 13 (quoting 42 U.S.C. § 7545(o)(9)(B)(i)); see also Vaughn Index at 3. There is an obvious "business interest" in information that reveals "favorable" (or unfavorable) "market conditions" that, if disclosed, "would help rivals to identify and exploit [a] compan[y's] competitive weaknesses." Baker & Hostetler LLP v. U.S. Dep't of Commerce, 473 F.3d 312, 319–20 (D.C. Cir. 2006) (finding letters including "assessment[s] of the commercial strengths and weaknesses of the U.S. lumber industry" to "plainly contain commercial information within the meaning of Exemption 4").

Plaintiffs rejoin that EPA separately redacted from its decision documents the actual financial and business information that refineries submitted to justify their claims of disproportionate economic hardship, and they do not challenge those redactions. See Reply at 3. True, but irrelevant. Even the bare fact that a refinery has claimed disproportionate economic hardship could, as the agency explained, "provide competitors and other market participants with key insights into the refinery's financial and competitive position." Vaughn Index at 3. Such information, for instance, can affect a refinery's access to credit or the contract terms its customers are willing to accept — as is evident from multiple refineries' submissions to EPA (which the Court has reviewed *in camera*). In this sort of circumstance, where "the identities of which companies have participated in [a government program]" or have sought to participate in that program "could have a commercial or financial impact on the companies involved," the fact

11

of participation itself constitutes commercial information. Elec. Privacy Info Ctr. v. U.S. Dep't of Homeland Sec. (EPIC), 117 F. Supp. 3d 46, 63 (D.D.C. 2015).

### C. Obtained from a Person

The next question is whether a refinery's status as a petitioner for a small-refinery RFS exemption, or the grant or denial of that petition, constitutes "information obtained from a person." 5 U.S.C. § 552(b)(4). "Person" is defined in FOIA to include corporations, partnerships, associations, and other private organizations. See 5 U.S.C. § 551(2).

Here, Plaintiffs make a compelling argument that the fact that a petition was granted or denied is not information obtained from a person, since the grant or denial was EPA's decision. As the Second Circuit persuasively explained in rejecting an Exemption 4 claim over "documents that show what loans . . . Federal Reserve Banks . . . made," "[T]he fact of the loan [itself] . . . cannot be said to be 'obtained from' the borrower" because that information "was generated within a Federal Reserve Bank upon its decision to grant a loan." Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys., 601 F.3d 143, 148 (2d Cir. 2010). "[I]t cannot be said that the government 'obtained' information as to its own acts and doings from external sources or persons." Id. at 149; see S. Alliance for Clean Energy v. U.S. Dep't of Energy, 853 F. Supp. 2d 60, 75 (D.D.C. 2012) ("[I]nformation generated by the government is not exempt from disclosure under Exemption 4 simply because it is based upon information supplied by persons outside the agency."). The same principle applies to the fact that EPA granted or denied a refinery's exemption petition: that specific piece of information is not obtained from a refinery because only the agency generated it.

That, however, is not the end of the road here. As discussed above, disclosing the name and location of the refinery at issue in an EPA decision document would also necessarily reveal a

12

separate piece of commercial information — namely, that the refinery had petitioned for an exemption in the first place. See, e.g., Def. Opp. at 8 ("The two withheld data elements identify small refiners that have petitioned for . . . [an] exemption."). Although the Court can find no precedent on which to rely, it seems clear that this sort of information is obtained from the petitioning entity. Consider a slightly different hypothetical in which Plaintiffs submitted a FOIA request for the affected refineries' petitions themselves, rather than EPA's decisions on those petitions. EPA would likely have redacted from those petitions each refinery's name and location to avoid revealing the same commercial information at issue here: the fact that the refinery applied. In such a case, the Court doubts that anyone would think that such information fails the "obtained from a person" prong, as it is in no sense "generated by the government." S. Alliance, 853 F. Supp. 2d at 75. So too here.

The upshot, accordingly, is that a refinery's status as a petitioner for an exemption, if not the result of that petition, qualifies as both (1) commercial information and (2) information obtained from a person. If that information is also (3) privileged or confidential, it comes within Exemption 4 and justifies EPA's redactions here.

D. Privileged or Confidential

As this Court has recently explained, see WP Co., 2020 WL 6504534, at *5–6, the test for whether commercial information qualifies as "privileged or confidential" is in some flux. For decades, the rule has been that "commercial information provided to the Government on a voluntary basis is 'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person [or entity] from whom it was obtained." Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 879 (D.C. Cir. 1992). Complicating matters, the Supreme Court recently explained that the plain meaning of

13

the word "confidential" might imply an additional necessary condition: not only must the information be "customarily kept private, or at least closely held, by the person imparting it," but the party receiving the information must also "provide[] some assurance that it will remain secret." Food Marketing, 139 S. Ct. at 2363. The Supreme Court, however, did not resolve whether the second condition is mandatory, id., and it is therefore "an open question . . . whether government assurance that information will remain private is necessary for such information to qualify . . . under Exemption 4." WP Co., 2020 WL 6504534, at *6.

This Court will return to that question presently. Before getting there, it must address what is indisputably the heart of the test: namely, whether the Government has "show[n] that the commercial or financial information" — here, the fact that the affected refineries applied for a small-refinery exemption — is "'both customarily and actually treated as private.'" Id. (quoting Food Marketing, 139 S. Ct. at 2366). The question is "how the particular party customarily treats the information, not how the industry as a whole treats the information." Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin., 244 F.3d 144, 148 (D.C. Cir. 2001) (citing Critical Mass Energy, 975 F.2d at 872, 878–80). As will become clear, while most of the refineries at issue in the redacted documents treat their small-refinery exemption application as private, it seems that not all do.

    1. *Customarily and Actually Treated as Private*

As required by agency regulations, after receiving Plaintiffs' FOIA requests for its small-refinery-exemption decision documents, EPA contacted each refinery and allowed it to denote certain information as confidential and substantiate that claim. See Miller Decl., ¶¶ 29–34; 40 C.F.R. § 2.204(f). Of the 72 decision documents at issue, the petitioning refineries in ten did not ask the agency to keep the fact of their application secret; the rest did. Id., ¶¶ 31, 34. For those

62 remaining records, EPA's legal team reviewed the petitioners' substantiations and undertook their own analyses by, for instance, reviewing public filings for any mention of the purported CBI. Id., ¶ 42. In the end, the agency concluded that the refineries implicated in 28 decision documents had not kept confidential their "status as a petitioner and/or recipient of a small refinery exemption" and thus "did not meet the confidential element of Exemption 4." Id., ¶ 36. EPA has accordingly turned over those documents to Plaintiffs with the identifying information unredacted. At issue, then, are the other 34 documents involving refineries that EPA has concluded do indeed "customarily and actually treat[] as private" the fact that they sought exemptions. Food Marketing, 139 S. Ct. at 2566; see Miller Decl., ¶ 37; Vaughn Index at 4 ("After careful consideration, based on the affected refineries' substantiations, [EPA] found that the affected refineries demonstrated that each customarily and actually treat the withheld information — in the context of its status as a petitioner . . . of a small refinery exemption — as private.").

At EPA's urging, the Court ordered that the relevant substantiations be submitted *in camera* to facilitate its review of the agency's decisions on this score. See Minute Order of January 21, 2021. Upon examination of those submissions and EPA's confidentiality determinations, the Court agrees in most cases that the petitioning refinery identified in the exemption decision document "customarily and actually treated as private" the fact that it had applied for an exemption.

As to seven decision documents, however, the Court does not agree with EPA's determinations or, at a minimum, finds them unpersuasive on the current record. Each of these documents involves a refinery that kept confidential the fact of its petition in the specific year at issue, but did not keep confidential the fact of its petition(s) for another year or years. (The

15

relevant petitions are listed in a sealed Appendix to this Opinion.)  The agency appears to have concluded that so long as a refinery closely held one petition, regardless of whether it disclosed its petitions in other years, the one closely held petition was "customarily and actually treated as private."  In other words, EPA's confidentiality determinations consider each year's petition in a vacuum.  The Court is skeptical that such an approach is permissible.  While a refinery that, for instance, kept its 2015 petition secret while disclosing its 2016 petition "actually" treated its 2015 petition as confidential, it is difficult to say that it "customarily" treated its seeking of relief so.  EPA, however, did not grapple with that issue in its confidentiality determinations, affidavits, or Vaughn Index.

For this reason, the Court finds that EPA has not adequately "sustain[ed]" its decision to withhold the name and location of the refineries identified in these seven decision documents.  Reporters Comm. for Freedom of Press, 489 U.S. at 755.  It will, accordingly, partially remand this matter to EPA for it to reexamine, in light of this guidance, whether the refineries mentioned in the seven decision documents customarily treat as private their status as small-refinery-exemption petitioners.

### 2. *Government Assurance of Privacy*

Given the Court's decision as to the 27 remaining documents involving refineries that do closely guard their status as exemption petitioners, it must return to the question left open in Food Marketing: must those seeking to protect their information also receive a government assurance of privacy in order to qualify for Exemption 4?  The Government argues that this additional condition is not required, and that, even if it is, it provided an implicit (though not explicit) assurance that refineries would not be identified publicly.  See Def. Opp. at 23, 27–28.  Plaintiffs respond that EPA has not expressly or impliedly so promised.  See Pl. Reply at 9–10.

Although several district courts have resolved Exemption 4 disputes since Food Marketing, none has held that this potential second prong must be met. See, e.g., Ctr. for Investigative Reporting v. U.S. Customs & Border Prot., 436 F. Supp. 3d 90, 113 (D.D.C. 2019) ("Given that the defendants' declarations are already deficient for other reasons, at this stage there's no need to resolve whether Exemption 4 in fact imposes an assurance of privacy requirement.") (cleaned up); Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Commerce, No. 18-3022, 2020 WL 4732095, at *3 (D.D.C. Aug. 14, 2020) (assuming without deciding that second prong exists and finding it satisfied by implicit assurance of privacy). Put differently, no court has yet held that "privately held information lose[s] its confidential character for purposes of Exemption 4 if it's communicated to the government without" privacy assurances. Food Marketing, 139 S. Ct. at 2363.

This Court will not, and indeed cannot, be the first. The current law of the D.C. Circuit, which remains binding authority, is that information is confidential under Exemption 4 "if it is of a kind that would customarily not be released to the public by the person [or entity] from whom it was obtained." Critical Mass Energy, 975 F.2d at 879; see Ctr. for Investigative Reporting, 436 F. Supp. 3d at 109 ("Critical Mass and its progeny . . . supply the framework."). Under that test, the refinery information at issue here qualifies as confidential (with the possible exception of those refineries discussed above). Were this Court to hold that the information is not confidential because a second necessary condition exists that is not met here, it would essentially be overruling Critical Mass Energy or at least declining to faithfully apply it. Absent a Supreme Court holding squarely abrogating Circuit precedent — which Food Marketing clearly is not — this Court has no power to depart from the result mandated by that precedent. See United States v. Torres, 115 F.3d 1033, 1036 (D.C. Cir. 1997) ("[D]istrict judges, like panels of [the D.C.

17

Circuit], are obligated to follow controlling circuit precedent until either [the D.C. Circuit], sitting en banc, or the Supreme Court, overrule it.").

Even if this Court were free to reach a result at odds with Critical Mass Energy, it would not read the word "confidential" to impose a blanket requirement that the government provide an assurance of privacy in every case in which it asserts Exemption 4. Down that path, it seems, lie many fairly arbitrary disputes over whether such an assurance can be implied. Cf. Citizens for Responsibility, 2020 WL 4732095, at *3 (finding implied assurance because government would lose "trust of the American business community" if it disclosed information at issue). The better approach would be that privately held information is generally confidential absent an express statement by the agency that it would not keep information private, or a clear implication to that effect (for example, a history of releasing the information at issue). See Gellman v. Dep't of Homeland Sec., No. 16-635, 2020 WL 1323896, at *11 n.12 (D.D.C. Mar. 20, 2020) (finding information confidential even where no express or implied assurance of confidentiality was made); WP Co., 2020 WL 6504534, at * 9 (arguing that express agency disclaimer of confidentiality "likely" would render information non-confidential); Office of Information Policy, Step-By-Step Guide for Determining if Commercial or Financial Information Obtained from a Person is Confidential Under Exemption 4 of the FOIA, Dep't of Justice, https://bit.ly/2MRXpuk (last updated October 7, 2019) (taking this view). Other than pointing to a proposed regulation that never went into effect, see Pl. SJ Mot. at 16, Plaintiffs here offer nothing approaching a clear agency warning that refinery petitions would be publicly disclosed. That makes sense given the agency's practice of keeping secret essentially all information about small-refinery exemptions, which changed only after the petitions at issue here were submitted.

At last, then, we reach the finish line. With the exception of the seven decision documents discussed above, EPA has sufficiently demonstrated that its challenged redactions of the refinery names and/or locations are necessary to avoid revealing information — to wit, the fact that those refineries applied for RFS relief — that is (1) commercial; (2) obtained from a person; and (3) privileged or confidential. As to those records, therefore, the agency's withholdings are justified by Exemption 4, and the Court will deny Plaintiffs' Motion for partial summary judgment to the extent it claims otherwise.

**IV.     Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part Plaintiffs' Motion for Partial Summary Judgment. As to the seven decision documents identified above, the Court will grant the Motion and remand to the agency for it to determine anew whether the affected refineries customarily treat as private the fact that they have applied for a small-refinery exemption. As to the other documents, the Court will deny the Motion. An Order so stating shall issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  February 16, 2021